UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>    v.<br><br>PAUL SEIFERT, et al.,<br><br>               Defendants. | Case No. 2:11-cr-00388-MMD-CWH<br><br>ORDER<br><br>(Defendant's Objection to Magistrate's Report and Recommendation to Deny Motion to Dismiss for Outrageous Government Conduct – dkt. no. 62) |
|---|---|

**I.    SUMMARY**

Before the Court is Defendant Paul Seifert's Objection to the Magistrate's Report and Recommendation to Deny his Motion to Dismiss for Outrageous Government Conduct. (Dkt. no. 62.) For the reasons stated below, the Court accepts and adopts the Magistrate Judge's Report and Recommendation in full. The Motion to Dismiss is accordingly denied.

**II.    BACKGROUND**

Because the Report and Recommendation ("R&R") (dkt. no. 61) contains a detailed account of the facts in this case, this Order only briefly recounts the pertinent facts.

In February 2008, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), in conjunction with the Las Vegas Metropolitan Police Department ("LVMPD"), commenced Operation Thunderhead. As part of the Operation, a confidential informant

("CI") told several members of the Las Vegas Hells Angels motorcycle group, including Seifert, that the CI was involved in large-scale narcotics trafficking. Seifert and a few other Hells Angels members approached the CI and told him they would help provide security or whatever else was needed to facilitate his drug transactions. Seifert referred to these services as "side jobs" or "tax free."

On April 20, 2008, Seifert sent a text message and made a phone call to the CI, and these communications led to Seifert accompanying the CI to a staged small narcotics transaction on April 22, 2008. There, Seifert showed the CI that he was armed with a 9 mm handgun and handled the purported narcotics.[1] Seifert was paid $300 for providing security to the CI that evening. On May 2, 2008, Seifert met with the CI to discuss providing security for a larger narcotics transaction. This led to a May 8, 2008, staged transaction, where Seifert accompanied the CI to a hotel room. There, the CI engaged in an undercover narcotics transaction for ten kilograms of cocaine.

On November 1, 2011, Seifert was indicted for Conspiracy to Possess with Intent to Distribute a Controlled Substance, 21 U.S.C. § 846.[2]

Defendant filed a Motion to Dismiss, arguing that the government's conduct in this case constitutes "outrageous government conduct" in violation of the Due Process Clause of the Fifth Amendment to the Constitution. (Dkt. no. 56.) Seifert claims that the government targeted him because of his membership in Hells Angels despite its knowledge that he was not previously involved in narcotics sales. The Magistrate Judge denied Defendant's Motion in his Report and Recommendation. (Dkt. no. 61.) Defendant now objects to the R&R.

---

[1] Mr. Seifert disputes this fact and states that he was not armed. (Dkt. no. 56 at n.3.)

[2] Mr. Seifert was also indicted for Sale of a Firearm to a Prohibited Person under 18 U.S.C. §922(d)(1) and 924(a)(2) and Distribution and Possession with Intent to Distribute a Controlled Substance under 21 U.S.C. § 841(a)(1) and (b)(1)(C) on November 1, 2011. Mr. Seifert explains that he filed the underlying Motion to Dismiss in this case rather than those cases because it has a lower case number. (Dkt. no. 56 at n.2.)

### III. DISCUSSION

#### A. Legal Standard

28 U.S.C. § 636(b)(1)(C) requires the Court to make a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." After conducting a de novo review, the Court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. 28 U.S.C. § 636(b)(1)(C); *see also* Local Rule IB 3-1.

#### B. Outrageous Government Conduct

In order to succeed on a claim for outrageous government conduct, a defendant must establish that the government's conduct "violates fundamental fairness and is 'shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment.'" *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008) (citing *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003)).

*Gurolla* held that "[t]his standard is met when the government engineers and directs a criminal enterprise from start to finish." 333 F.3d at 950 (internal brackets removed). However, the standard "is not met when the government merely infiltrates an existing organization, approaches persons it believes to be already engaged in or planning to participate in the conspiracy, or provides valuable and necessary items to the venture." *Id.* Therefore, law enforcement conduct becomes constitutionally unacceptable where government agents engineer and direct a criminal enterprise from start to finish or when government conduct constitutes, in effect, the generation of new crimes merely for the sake of pressing criminal charges against the defendant. *United States v. Bogart*, 783 F.2d 1428, 1436 (9th Cir. 1986).

"Outrageous government conduct is not a defense, but rather a claim that government conduct in securing an indictment was so shocking to due process values that the indictment must be dismissed." *United States v. Montoya*, 45 F.3d 1286, 1300 (9th Cir. 1995) (citing *Hampton v. United States*, 425 U.S. 484 (1976); *United States v. Russell*, 411 U.S. 423, 431-32 (1973)). "The Government's involvement must be *malum*

*in se* or amount to the engineering and direction of the criminal enterprise from start to finish." *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991) (citation omitted). "In short, a defendant must meet an extremely high standard." *Id.* Further, "[u]nder the extremely high standard of this doctrine, an indictment should be dismissed only when the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice." *Montoya*, 45 F.3d at 1300 (citations and internal quotation marks omitted).

### C. Defendant's Objections

#### 1. Whether the Government "Created" the Charged Offense

Defendant claims that the government created the charged offense by fashioning a situation ripe for criminal activity. Defendant argues that "[t]he government took a person that they knew was not involved in the sale of controlled substances, targeted him because of his membership in a motorcycle club, and unbe[knowst] [sic] to him attempted to make him a conspirator in a 10 kilogram cocaine transaction."[3] (Dkt. no. 62 at 7.)

Defendant overstates the government's involvement. Although Mr. Seifert may not have been involved in his criminal activity but for the CI approaching Mr. Seifert and the Hells Angels, Mr. Seifert, acting on independent volition, approached the CI on at

---

[3]Defendant is incorrect that the government approached a person whom it "knew was not involved in the sale of controlled substances." (Dkt. no. 62 at 6.) In fact, Mr. Seifert himself explains that on December 4, 2007, he sold 2.3 grams of Methamphetamine to a CI. (Dkt. no. 60 at 3, 5.) Defendant mischaracterizes this event in his Reply brief. He states that "[t]he report . . . evidences that Mr. Seifert was not interested in any form of drug transaction with the CI. Rather, the CI persisted (at the direction of LVMPD) and after 4 attempts finally allegedly received 2.3 gross gram of Methamphetamine from Mr. Seifert." (Dkt. no. 60 at 3.) However, such persistence on the part of the CI is not evident from the attached report. Rather, the report states that the CI met with Mr. Seifert four different times throughout the evening of December 4, 2007, to arrange the drug transaction – *not* that the CI coerced or cajoled Seifert into participating in the drug deal. (*Id.* at 5.) Nevertheless, this prior criminal activity occurred at the behest of the government, and therefore does not weigh as strongly against a holding of outrageous governmental conduct as the Magistrate held. (*See* dkt. no. 61 at 4.) In fact, this prior criminal behavior does not factor into the Court's analysis here.

least three different occasions about participating in the sale of illicit narcotics (the text message, the telephone call, the May 8, 2008, meeting). This is clearly not a scenario in which the government "engineer[ed] and direct[ed] the criminal enterprise from start to finish[]," *see Smith*, 924 F.2d at 897, because there would have been no criminal enterprise without Defendant's activity. The government did not coerce or conspire with Defendant about his participation. And Defendant understood the stakes of each narcotics transaction; in fact, after participating in a small-scale sale of cocaine, he asked the CI whether he could be involved in a larger transaction.

Defendant points to two cases where courts found outrageous government conduct, *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978) and *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), arguing that these cases are analogous to this one.[4] However, these cases are distinguishable, and only further demonstrate why Defendant's Motion must fail.

In *Twigg*, 588 F.2d at 380,

> the government informant initiated contact with the defendants and proposed the idea of establishing a laboratory where they could manufacture narcotics. The Government provided a farmhouse as the location of the illegally operated laboratory, supplied chemicals and glassware, and facilitated the purchase of the bulk of the materials used. In addition, the government informant furnished all of the laboratory expertise and performed the lion's share of the manufacturing while the defendants provided minimal assistance. Under these circumstances, the Third Circuit held that governmental involvement in the criminal activities at issue "reached 'a demonstrable level of outrageousness.'"

///

///

---

[4] Notably, both cases Defendant cites to have been criticized, and courts rarely hold in a defendant's favor on a motion to dismiss for outrageous government conduct. *See United States v. Cromitie*, 781 F. Supp. 2d 211, 225 (S.D.N.Y. 2011) ("The trajectory of the law is away from *Twigg*, not toward it."); *United States v. Luttrell*, 889 F.2d 806, 812 (9th Cir. 1989) *opinion amended in part, vacated in part on reh'g*, 923 F.2d 764 (9th Cir. 1991) ("*Twigg* has not fared particularly well in the courts in general . . . ."); *see also United States v. Haas*, 141 F.3d 1181, at *1 (9th Cir. 1998), (noting that *Greene* "may be an entrapment rather than an outrageous government conduct case. . . . [*Greene*] does not reflect the current law of the circuit on outrageous government conduct.")

*United States v. Jacobs*, 751 F. Supp. 733, 740 (N.D. Ill. 1990) (citing *Twigg*, 588 F.2d at 380).

In *Greene,* "the only Ninth Circuit case where the outrageous government conduct defense has been successfully raised," *United States v. Wilson*, No. 10CR3089 BTM, 2012 WL 460342, at *2 (S.D. Cal. Feb. 10, 2012),

> the Ninth Circuit reversed conspiracy and bootlegging convictions due to the extent of the government's involvement in creating and maintaining the criminal operations. [There, the] undercover agent approached defendants after their prior arrest on bootlegging charges, provided materials for the still, found an operator and location for the still, and supplied sugar at wholesale prices. The agent was also the still's sole customer. The government's involvement lasted over two-and-a-half years. In reversing the convictions, the Ninth Circuit reasoned:
>
>> We do not believe the Government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators. As pointed out in *Sherman v. United States*, 356 U.S. [369,] 372 [(1958)], a certain amount of stealth and strategy "are necessary weapons in the arsenal of the police officer." But, although this is not an entrapment case, when the Government permits itself to become enmeshed in criminal activity, from beginning to end, to the extent which appears here, the same underlying objections which render entrapment repugnant to American criminal justice are operative. Under these circumstances, the Government's conduct rises to a level of "creative activity" (*Sherman*, [356 U.S at] 372), substantially more intense and aggressive than the level of such activity charged against the Government in numerous entrapment cases we have examined.

*Wilson*, 2012 WL 460342, at *2 (citing *Greene*, 454 F.2d at 787).

In both *Greene* and *Twigg*, the government not only provided the opportunity to commit the crimes, but also the means. Here, the CI provided Seifert only with the opportunity to commit the crime. Seifert's approaching the CI about participating in a larger narcotics transaction is particularly enlightening, because this fact demonstrates that Seifert was actively seeking out participation in large-scale narcotics transactions. This stands in contrast to the defendants in *Twigg* and *Greene*, who took almost all their cues from the government.

In fact, "[i]t appears that the successful assertion of the outrageous government conduct defense is extremely rare." *United States v. Wong*, 1996 WL 225008, No. 95-

20075-RMW, at *5 (N.D. Cal. April 29, 1996).  This is because "[g]overnment agents may lawfully use methods that are neither appealing nor moral if judged by abstract norms of decency." *United States v. Slaughter*, 891 F.2d 691, 696 (9th Cir. 1989).  For example, in *Slaughter*, though the court noted that the government's behavior was less-than-exemplary, it determined that the conduct was not so outrageous to warrant dismissal. *Id.* There,

> [defendant Slaughter, a] 54-year old divorcée[,] worked as a polygraph examiner. He was suspected of having "fixed" a number of tests to pass individuals even when they were lying.  He had also been suspected of using and distributing cocaine for several years, but because of his involvement with the law enforcement community, it was difficult for any agency to investigate these rumors.  When a "very attractive young lady" who was working as an undercover informant (and who was 24 years old) moved to town, the FBI used her to lure Slaughter into a number of compromising situations.  The FBI instructed her to ask Slaughter if she could buy cocaine from him. He responded "no" on eleven separate occasions.  She persisted, however, and eventually, Slaughter sold her a gram of cocaine for $200.  Before this exchange took place, she discussed the possibility of moving in with him, and "[o]ther provocative and sexually explicit topics were also discussed." [*Slaughter*,] 891 F.2d at 694 n.1. A few days later, he sold her some more cocaine.  He was ultimately convicted of two counts of distribution of a controlled substance.

*United States v. Simpson*, No. 09-1040-PHX, 2010 WL 1611483, at *7 (D. Ariz. Apr. 20, 2010).  *See also United States v. Luttrell*, 889 F.2d 806, 811-14 (9th Cir. 1989) (counterfeit credit card sting operation not outrageous government conduct); *United States v. Citro*, 842 F.2d 1149, 1152-53 (9th Cir. 1988) (same); *United States v. Bonnano*, 852 F.2d 434, 437-38 (9th Cir. 1988) (FBI informant posing as potential investor in fraudulent scheme did not constitute outrageous government conduct); *United States v. Simpson*, 813 F.2d 1462, 1464-1471 (9th Cir. 1987) (FBI manipulating woman into providing sexual favors to lure target into selling heroin not outrageous conduct); *United States v. Emmert*, 829 F.2d 805, 810-13 (9th Cir. 1987) (FBI approaching college student and offering $200,000 finder's fee for securing cocaine supply for government agent not outrageous conduct); *Shaw v. Winters*, 796 F.2d 1124, 1125-26 (9th Cir.1986) (food stamp sting operation not outrageous government conduct); *United States v. Wiley*, 794 F.2d 514, 515-16 (9th Cir. 1986) (government

7

...

activation of scheme to smuggle drugs into prison not outrageous conduct); *United States v. Williams*, 791 F.2d 1383, 1386-87 (9th Cir. 1986) (prison authorities prior knowledge of escape plans not outrageous conduct); *United States v. Driscoll*, 853 F.2d 84, 85-87 (3d Cir.1988) (child pornography sting operation not outrageous government conduct); *United States v. Musslyn*, 865 F.2d 945, 946-947 (8th Cir. 1989) (same). *Slaughter* and the other cited cases demonstrate that even where the government provides much of the means for committing the criminal act, as occurred here, more is needed before the Court labels the government's conduct outrageous.

### 2. Whether Defendant was Armed

Seifert also asserts that the Magistrate Judge incorrectly found that he was armed during the April 22, 2008, narcotics transaction, and Seifert disputes this fact. After reviewing the Magistrate Judge's R&R, it is clear that this fact was not determinative to the Judge's ultimate decision. Nor is it determinative to this Court's disposition.

Further, "[a] charge in a complaint may be dismissed if it is subject to a defense that may be decided solely on issues of law[,]" and therefore "[a]rguments raised in a motion to dismiss that rely on disputed facts should be denied." *United States v. Tawahonga*, 456 F. Supp. 2d 1120, 1125 (D. Ariz. 2006). Therefore, because it is based on a disputed fact, Defendant's argument cannot serve as a basis for dismissal.

### III. CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Objection is OVERRULED and the Magistrate Judge's Report and Recommendation is ADOPTED in full.

IT IS FURTHER ORDERED that the Motion to Dismiss is DENIED.

DATED THIS 1st day of November 2012.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE